## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brian Laabs,                                      Case No. 20-cv-1399 (PAM/ECW)

        Plaintiff,

    v.                                                      **ORDER**

Nor-Son, Inc.,

        Defendant.

This matter is before the Court on Plaintiff's Motion for Protective Order (Dkt. 43) and Defendant's Motion to Compel (Dkt. 49). For the reasons set forth below, the Motions are granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Plaintiff Brian Laabs ("Laabs" or "Plaintiff") brought this case following the termination of his employment with Defendant Nor-Son, Inc. ("Nor-Son" or "Defendant"). The Complaint alleges as follows: Laabs has many years of experience in construction, including over ten years of experience as a site lead in both commercial and residential construction. (Dkt. 1 ¶ 6.) For years prior to being hired by Nor-Son, he suffered from a physical condition that caused significant pain in his knees. (*Id.* ¶ 7.) In or around April or May 2018, Nor-Son's Director of Construction, John Jacob called Laabs concerning working for Nor-Son. (*Id.* ¶ 8.) During their conversation, Laabs disclosed that he suffered from knee pain and that he anticipated knee-replacement surgeries within the next year or two. (*Id.*) Jacob hired Laabs over the phone, and Laabs began working for Nor-Son as a site supervisor in Nor-Son's commercial division

beginning May 2018.  (*Id.* ¶ 9.)

On October 21, 2019, Laabs called Jacob to discuss his upcoming medical appointment and knee surgery.  (*Id.* ¶ 13.)  Laabs also asked for information regarding medical leave and disability.  (*Id.*)  Jacob instructed Laabs to consult with Nor-Son's benefit administrator, Bonnie Gardiepy.  (*Id.*)  The next day, Laabs spoke with Gardiepy about short- and long-term disability and coverage under the Family and Medical Leave Act ("FMLA").  (*Id.* ¶ 14.)

On October 28, 2019, while Laabs met with the knee surgeon, he received two missed calls from Jacob.  (*Id.* ¶ 17.)  After the appointment, Laabs spoke to Jacob, who terminated Laabs' employment effective the previous working day, Friday, October 25, 2019.  (*Id.*)

Laabs alleges four counts in his Complaint: (1) violations of the FMLA, asserting Nor-Son treated his need for FMLA leave as a negative in deciding to terminate his employment, thereby discriminating against Laabs and avoiding its obligations under the FMLA; (2) disability discrimination in violation of Americans with Disabilities Act ("ADA"); (3) disability discrimination in violation of the Minnesota Human Rights Act ("MHRA"); and (4) a claim under the Employee Retirement Income Security Act ("ERISA"), based on his termination by Nor-Son for the purposes of interfering with Laabs' ability to secure benefits under Nor-Son's medical and disability plans.  (*Id.* ¶¶ 22-47.)  In his Complaint, Laabs claimed damages, including wage and benefit loss and emotional distress.  (*Id.* ¶¶ 29, 36, 43.)

In particular, Laabs seeks damages for "emotional distress" under his ADA and

MHRA claims.  (*Id.* ¶¶ 36, 43.)  In his answers to discovery, Laabs asserts that he:

> [I]s seeking only "garden variety" emotional distress damages.  He has neither been diagnosed with, nor sought treatment for, mental health issues before or after his termination, and does not assert in this litigation that he has suffered any physical injury as a result of Defendant's unlawful actions.

(Dkt. 53-1 at 38.)  He also claims the following income loss:

> Income Loss: Plaintiff's wages at the time of his termination was $85,000 annually, or $7083.33 monthly.  Benefits prior to his termination ran $80.00 monthly.  Continuing benefits through COBRA cost $700.00 a month, for a difference of $620.  Had Plaintiff's employment not been terminated, he would have earned roughly $77,900 in wages to date and paid roughly $7,700 less to date for benefits.  Plaintiff's wage loss damages are accruing.

(*Id.* at 39; *see also id.* at 69.)

In its Answer, Nor-Son asserts a number of affirmative defenses, including a failure to mitigate damages, that Laabs is not a qualified person with a disability for the purposes of the ADA and the MHRA, and the doctrine of after-acquired evidence.  (*See* Dkt. 5.)

Given this general background, the Court will proceed with analyzing the outstanding discovery disputes between the parties.

## II.   <u>LEGAL STANDARD</u>

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  While Rule 26 contemplates a liberal scope of discovery, this Court "possess[es] considerable discretion in determining the need for, and form of, discovery . . . ."  *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 949 (D. Minn. 2015) (citations omitted).

Further, not only must information sought in discovery be relevant, it must also be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  "In determining proportionality, courts consider numerous factors, including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, and importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'"  *Beseke v. Equifax Info. Servs., LLC*, No. 17-CV-4971-DWF-KMM, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018); *see also Klein v. Affiliated Grp., Inc.*, No. 18-CV-949 DWF/ECW, 2019 WL 1307884, at *3 (D. Minn. Mar. 22, 2019).  To this end, a court upon a motion or on its own "must" limit discovery, when the discovery is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action," or if the discovery is outside of the scope of Rule 26(b)(1).  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

With respect to subpoenas and protective orders, "Federal Rule of Civil Procedure 45 provides that 'the issuing court must quash or modify a subpoena that' among other

things 'requires disclosure of privileged or other protected matter' or 'subjects a person to undue burden.'" *Shukh v. Seagate Tech.*, LLC, 295 F.R.D. 228, 235 (D. Minn. 2013) (quoting Fed. R. Civ. P. 45(c)(3)).  Similarly, Rule 26 permits "[a] party or any person from whom discovery is sought" to seek a protective order and provides that a court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "There may also be good cause for a protective order where the discovery sought from a third party is not 'proportional to the needs of the case, considering the importance of the issues at state in the actions, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *In Re CenturyLink Sales Pracs. & Sec. Litig.*, No. CV 18-296 (MJD/KMM), 2020 WL 8256364, at *2 (D. Minn. Oct. 28, 2020) (quoting Fed. R. Civ. P. 26(b)(1)).

"The explicit mention of a party in [Rule 45] has been interpreted to provide standing for a party to contest discovery sought from third-parties." *Coleman v. Minneapolis Pub. Sch.*, No. 18-CV-2283 (DSD/ECW), 2020 WL 6042394, at *7 (D. Minn. Oct. 13, 2020) (marks and citations omitted).  The burden is on the movant to show the "good cause" required for issuance of the protective order.  *See Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973).  "To make this showing, the moving party cannot rely on broad or conclusory allegations of harm." *Northbrook Digit., LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 757 (D. Minn. 2008) (citing *Gulf

*Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981))

With these standards in mind, the Court will proceed with addressing the parties' respective motions.

### III.   ANALYSIS

### A.   Laabs' Motion for Protective Order[1]

Laabs seeks a protective order forbidding discovery sought by Nor-Son through two subpoenas issued to non-party Doran Companies ("Doran") on March 11, 2021.[2] (*See* Dkt. 43.)  Laabs had previously been employed by Doran and left employment with Doran in October 2016.  (Dkt. 47-1 at 94; Dkt. 53-1 at 120-29.)  Laabs had been employed by Doran for two to three years doing project supervision and commercial building projects.  (Dkt. 53-1 at 46.)  With respect to why he left Doran, Laabs testified as follows:

Q. Okay.  Why did you leave Doran?

A. I was kind of forced out of Doran.

Q. Okay.  And what do you mean?

A. You know, they, a VP of construction didn't like me and didn't want me, but I kind of had his number.

---

[1]   Nor-Son argues that Laabs did not properly meet-and-confer prior to bringing the Motion for Protective Order.  (Dkt. 62 at 7-8.)  However, Nor-Son's counsel conceded at the hearing that no additional meet-and-confer other than what had already occurred would help to resolve the issues in dispute.  Therefore, the Court will not deny the Motion for a Protective Order on this basis.  *See Berg v. United States*, No. CV 03-4642 (MJD/JSM), 2005 WL 8162842, at *1 (D. Minn. Dec. 23, 2005).

[2]   The Court notes that Nor-Son has not received any objection from Doran to either the duces tecum Subpoena or the deposition Subpoena.  (Dkt. 62 at 4.)

Q. Okay.  You had his number, tell me what you mean by that?

A. He wasn't what he claimed to be.

Q. Okay.  All right.  So were you fired from Doran?

A. Yes, you know that.

Q. Okay.  When you say yes, I know that, what do you, what are you saying, are you saying that I somehow knew that you were fired from Doran?

A. I believe so.

Q. Okay.  And how do I know that?

A. You, you've called my former employers, sir.

Q. And when you say you you mean, you're referring to, are you referring to Nor-Son, are you referring to us as lawyers?

A. I'm referring to, I'm referring to Kurt Erickson.

Q. Okay.  All right.  Okay.  To your knowledge did Nor-Son know that you had been fired from Doran?

A. I, I think that came up, I'm not positive.

Q. Okay.  So it's possible from your perspective that Nor-Son did not know you were fired from Doran, correct?

A. Yeah, it's also possible that they did know when I first started.

Q. So from your standpoint, both are possible?

A. Yes.

(Dkt. 53-1 at 86-87.)  As part of the end of his employment, Laabs entered into a severance agreement with Doran.

Nor-Son's subpoena for Doran's corporate deposition seeks testimony regarding the following topics:

1. The termination of the employment of Brian Laabs ("Laabs"), including the date of termination, the reason for termination, whether Mr. Laabs ever communicated that he was resigning, to whom he made such communication, if any, and to whom he communicated such resignation, if he did.

2. The reasons for and dates of all discipline received by Mr. Laabs during his employment with Doran, the type of discipline imposed (e.g., written warning, suspension, termination of employment), whether the discipline was changed or rescinded, and whether an internal investigative hearing was held regarding his discipline.

3. Mr. Laabs [sic] dates of employment, job titles during employment, and job duties and responsibilities for each position he held during his employment with Doran.

4. Any complaints of discrimination Mr. Laabs made against Doran, including but not limited to internal complaints and complaints filed with the EEOC or any other federal or state agency; the date of such complaints; the subject matter and allegations of such complaints; and the outcome of such complaints.

5. Any claimed medical restrictions or disabilities, accommodation requests, or leave requests pertaining to Mr. Laabs, or any other instances where Mr. Laabs claimed to be unable to perform his job duties.

(Dkt. 47-1 at 64.)  Nor-Son also issued a subpoena for documents to Doran for the

following records:

Any and all documents and/or records regarding Brian Laabs, Social Security No. XXX-XX-[XXXX], including but not limited to applications for employment, documents and notes from interviews or meetings regarding Mr. Laabs application for employment, hiring, or the interview process, personnel files, manager files, investigatory files, human resource files, wage records, benefit records, dates of employment and positions held (including job descriptions), or independent contractor relationship, disciplinary records, attendance records, benefit summaries, documents related to termination or layoff (and the reasons for Mr. Laab's [sic] selection for termination or layoff), pay stubs, earning summaries, documents relating to or reflecting upon job performance or work conduct, performance reviews, evaluations, developmental plans, correspondence, notes, memoranda, documents relating to charges or complaints of unfairness, retaliation, and/or discrimination and investigatory records regarding same in your possession.

(*Id.* at 78.)

Laabs argues that the Court should quash the subpoenas on the basis that the information sought is not relevant to the claims and defenses in this action.  (Dkt. 45 at 10-15.)  Specifically, Laabs argues that employment records and testimony from prior employers are not relevant to the issue of mitigation, as mitigation focuses on a plaintiff's efforts to earn income after the defendant terminates him or her.  (*Id.* at 13.)  Further, Laabs contends that the discovery sought is not applicable to the after-acquired evidence defense based on the assertion that Laabs lied to Nor-Son during the hiring process by misrepresenting the nature of his departure from Doran because: (1) Laabs testified in his deposition that he did not know one way or the other whether he had told Nor-Son that he was involuntarily terminated from his employment at Doran; Nor-Son hiring manager Jacob testified that he could not remember whether he asked Laabs whether he had been fired from a prior job, whether he asked Laabs whether he quit or resigned or was fired from his job at Doran, or whether Laabs told Doran he resigned from Doran; (2) Jacob further testified that, prior to hiring Laabs, he received and reviewed an Aerotek reference check that plainly shows Laabs was involuntarily discharged; and (3) the information is unnecessary since Laabs has already testified he was involuntarily discharged from Doran due to a personality conflict with one of the managers.  (*Id.* at 13-14.)

The Eighth Circuit has recognized the after-acquired evidence doctrine as a defense for employers with respect to limiting an employer's potential damages:

The after-acquired evidence doctrine applies when an employee is fired for

> an unlawful reason but the employer later learns of other conduct that, by
> itself, would have resulted in discharge had it come to the employer's
> attention, and it limits the employee's damages to the period of time "from
> the date of the unlawful discharge to the date the new information was
> discovered." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362[]
> (1995). It is the employer's burden to prove that it would have fired the
> employee upon discovery of the evidence. *E.E.O.C. v. Dial Corp.*, 469 F.3d
> 735, 745 (8th Cir. 2006). The employer must show "that the wrongdoing
> was of such severity that the employee in fact would have been terminated
> on those grounds alone if the employer had known of it." *McKennon*, 513
> U.S. at 362-63[].

*Smith v. AS Am., Inc.*, 829 F.3d 616, 625-26 (8th Cir. 2016).

That said, the Supreme Court has recognized the potential abuses that could result

based on the use of this doctrine by employers:

> Where an employer seeks to rely upon after-acquired evidence of
> wrongdoing, it must first establish that the wrongdoing was of such severity
> that the employee in fact would have been terminated on those grounds alone
> if the employer had known of it at the time of the discharge. **The concern
> that employers might as a routine matter undertake extensive discovery
> into an employee's background or performance on the job to resist
> claims under the Act is not an insubstantial one, but we think the
> authority of the courts to award attorney's fees, mandated under the
> statute, 29 U.S.C. §§ 216(b), 626(b), and to invoke the appropriate
> provisions of the Federal Rules of Civil Procedure will deter most
> abuses**.

*See McKennon*, 513 U.S. at 362-63 (emphasis added).

In this case, Nor-Son has asserted the affirmative defense of after-acquired

evidence. (Dkt. 5 at 12.) However, given the possibility of abuses with respect to the

after-acquired defense, as recognized by the Supreme Court in *McKennon*, the Court

finds that the mere invocation of the defense alone does not give rise to unfettered access

to past employment records. The Court notes that under Rule 26, one of the factors that

must be considered is the importance of the proposed discovery in resolving a dispute.

As one court has persuasively held:

> The court must take into account "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." **The last factor is critical here. Best Lock has not identified any specific concerns or targets or reasons for its sweeping and intrusive discovery requests. It has not provided any information suggesting it has a specific basis for believing that an after-acquired evidence defense might be developed here**. Thus, there is no specific reason before the court suggesting that the discovery Best Lock seeks from plaintiff's past, current, and prospective employers would have any material importance for resolving the issues presented in this case. On this record, therefore, the subpoenas look like nothing more than a fishing expedition, or, more accurately, an exercise in swamp-dredging and muck-raking.

*Perry v. Best Lock Corp.*, No. IP 98-C-0936-H/G, 1999 WL 33494858, at *3 (S.D. Ind. Jan. 21, 1999) (emphasis added).

As set forth above, Laabs points to his own testimony that he does not remember whether he told Nor-Son that he was involuntarily terminated from his employment at Doran. Indeed, Laabs testified that it was possible that Nor-Son knew that he had been fired, but he was not sure. (Dkt. 47-1 at 23 (Laabs Dep. at 47).) Similarly, Nor-Son hiring manager Jacob testified that he could not remember whether he asked Laabs whether he had been fired from a prior job, whether he asked Laabs whether he quit or resigned, if he was fired from his job at Doran, or whether Laabs told him he resigned from Doran. (*Id.* at 87 (Jacobs Dep. at 56).) At most, this amounts to a dispute of fact regarding Nor-Son's knowledge and does not foreclose an after-acquired defense. While Laabs claims that the Aerotek reference check done by Nor-Son plainly shows Laabs was involuntarily discharged, it actually provides: "The reason for Brian leaving Doran is because Doran lacked the contracts to keep him on board. He was one of the newer

Superintendents so they had to let him go.  Would have loved to keep him onboard." (*Id.* at 88.)  This actually supports the assertion that Nor-Son did not know that Laabs had been terminated due a personality conflict as now claimed by Laabs.  In sum, Laabs opened the door to the after-acquired defense with his testimony regarding his termination from Doran, and Nor-Son should be allowed to go directly to Doran to determine the complete reason(s) for the termination of Laabs' employment.  The fact that there may be a dispute as to the real reason regarding Laabs' termination by Doran, and Nor-Son's knowledge thereof, is not a reason to quash the subpoena; it merely establishes that these are issues for the fact-finder to decide.

### 1.    Doran Deposition Subpoena

Given this backdrop, the Court concludes that with respect to the deposition subpoena, Doran will be required to produce a witness who can testify as to Topic No. 1, which relates to the termination of Laabs' employment.

As to Topic No. 2, Doran will be required to provide testimony regarding discipline of Laabs only to the extent that it is relevant to Topic No. 1.  In other words, Doran will only need to prepare a witness on discipline to the extent that it was at least part of the basis for the termination of Laabs' employment.  The Court is not inclined to allow Nor-Son to go "muck-racking" for more defenses regarding any discipline that did not lead to the termination of Laabs' employment.

There was no objection by Laabs as to Topic No. 3 in the moving papers or at the hearing.  As such, Doran shall be required to provide a witness that can competently testify as to Topic No. 3.

Topic No. 4 seeks testimony regarding any complaints of discrimination made by Laabs. In *Sellars v. CRST Expedited, Inc.*, the court found that portions of prior employment records were discoverable for the limited purpose of determining whether the plaintiff had made similar complaints to previous employers. No. C15-0117, 2016 WL 7173785, at *4 (N.D. Iowa Dec. 8, 2016) (citation omitted); *see also Bharadwaj v. Mid Dakota Clinic, P.C.*, No. 1:16-CV-262, 2017 WL 11591196, at *8 (D.N.D. Mar. 9, 2017). As such, the Court will only require Doran to produce a witness to the extent that Laabs made similar complaints as here related to the FMLA or disability discrimination.

Topic No. 5 seeks information related to Laabs' claimed medical restrictions, disabilities, or accommodation requests. Laabs asserts in his Complaint:

> For years prior to being hired by Nor-Son, Laabs suffered from a physical condition that caused significant pain in his knees. That condition substantially and materially limited his ability to walk long distances and run, and substantially limited the operation of his musculoskeletal system.

(Dkt. 1 ¶ 7.) Laabs also asserts that his knee condition was a qualifying disability for the purposes of his ADA and MHRA claims. (*Id.* ¶¶ 33, 40.) In order to establish a prima facie case of discrimination under the ADA, "an employee must show that she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of her disability." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013); *see also Weber v. Strippit, Inc.*, 186 F.3d 907, 912 n.4 (8th Cir. 1999) ("The MHRA defines a disability as an impairment that 'materially,' rather than 'substantially' limits one or more major activities, Minn. Stat. § 363.01, subd. 13," but "[t]he difference is merely semantic . . . , and we treat the

standards the same.").  Given the relevance of Laabs' allegation that his knee condition was a qualifying disability that had previously existed to his disability discrimination claim, the Court concludes that Nor-Son may ask Doran questions regarding any restrictions or accommodations pertaining to Laabs' knees.  Nor-Son may not ask about other medical conditions.

### 2.     Subpoena Duces Tecum

Consistent with the above, Nor-Son can seek documents related to the date of Laabs' employment and positions held, including job descriptions; documents related to termination of his employment, including documents relating to Laabs' performance or discipline only to the extent they pertain to the reasons for his termination; documents reflecting any complaints of disability discrimination or FMLA violations, and requests for accommodations or any other instances where Laabs claimed to be unable to perform his job duties due to his knees.  In addition, wage records should be produced given that Laabs is seeking front pay.  *See Quiles v. Union Pac. R.R. Co., Inc.*, No. 8:16CV330, 2018 WL 737403, at *2 (D. Neb. Feb. 6, 2018).

Otherwise, the Motion for a Protective Order is granted because the information sought by the subpoenas is not relevant or proportional to the needs of the case.

### B.     Nor-Son's Motion to Compel

The Court turns to Nor-Son's Motion to Compel, much of which overlaps with Laabs' Motion for Protective Order.  Nor-Son asks the Court to compel responses to Request Nos. 15 and 24, which generally seek information about Laabs' employment records from "past, present and prospective employers" (Dkt. 51 at 7-8), and Request No.

25, which seeks "[a]ny and all mental health records or reports, or invoices or bills relating to medical treatment from all mental health care providers," including, but not limited to, "health care records regarding alcoholism and violence" (*id.* at 10). Nor-Son also seeks further testimony from Laabs regarding a severance agreement. (*Id.* at 15-16.) The Court addresses the parties' arguments below.

### 1. Waiver of Objection as to Request Nos. 24-25[3]

Nor-Son argues that this Court should find Laabs' objections to Request Nos. 24 and 25 are waived because his responses to the discovery were served five days late. (*Id.* at 8-9; *see also* Dkt. 53-1 at 113, 118.) Request No. 24 is an extension of Request No. 15 set forth below, and Request No. 25 is the request for mental health records also addressed below. Given the short time frame (5 days late) and in the absence of any articulated prejudice by Nor-Son, the Court finds good cause to allow Laabs to assert his objections with no waiver. *See U.S. Bank Nat'l Ass'n v. Equity Bank*, No. CV 12-2023 (PAM/JJG), 2014 WL 12601036, at *4 (D. Minn. May 7, 2014) (finding good cause where the delay related to objections was brief and the party seeking waiver failed to propound any prejudice as the result of the untimeliness).

### 2. Employment Records

Nor-Son served the following request for documents for employment records regarding Laabs' past employers and any employers or prospective employers since Laabs left Nor Son:

---

[3] The Court notes that Nor-Son made the same argument as part of its opposition to Laabs' Motion for Protective Order. (Dkt. 62 at 6-7.)

**REQUEST NO. 15.**  Copies of all of the Plaintiff's employment records from his past, present and prospective employers including, but not limited to, applications, resumes, documents showing salaries, titles, reasons for termination, supervisors, and all letters and correspondence, including reference letters sent to employers and prospective employers, from January 1, 2010 through the present time. From January 1, 2010, through the present time, also provide copies of any and all of Plaintiff's applications and resumes to perform consulting work or independent contracting work of any kind, and all letters and correspondence, including reference letters, sent to persons or entities considering hiring or who actually hired you as a consultant or independent contractor.  (Should Plaintiff not have copies of the documents requested herein, a blank authorization form is attached. All information necessary for Defendants to obtain said records is to be completed by Plaintiff for all employers, prospective employers, consulting or independent contracting work, or prospective consulting or independent contacting work on separate authorization forms for each.)

(Dkt. 53-1 at 11-12.)

Laabs issued the following response:

**RESPONSE**:  Plaintiff objects to this request as overly broad, seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and propounded to harass and annoy.  Based on these objections, Plaintiff will not be producing documents relating to any employment or similar activities prior to his employment with Defendant and will not be providing authorizations with respect to his prior employment, or with respect to prospective employers following his unlawful termination.  Records relating to any subsequent employment will be limited to the categories of documents set forth in *Hendrickson v. Con-Way Freight*, No. 13-cv-2354 (JRT/LIB), 2014 WL 12770229, at * 4-5 (D. Minn. Apr. 28, 2014). Plaintiff further objects to this request as cumulative of Request No. 5. Subject to and without waiving these objections, see the documents that will be produced in response to Request No. 5.

(Dkt. 53-1 at 57-58.)

As part of its Motion to Compel, Nor-Son argues that it is entitled to an executed

authorization consistent with the information sought in Request No. 15.  (Dkt. 51 at 11.)

The Court agrees that Nor-Son is entitled to Laabs' past and post-termination wage records, as they are relevant to Laabs' claim for damages. *See Walker v. Nw. Airlines Corp.*, 2002 WL 32539635, at *2 (D. Minn. Oct. 28, 2002) (in employment discrimination case, finding "both past and post-termination wage and employment records are highly relevant to the issue of mitigation and to the computation of damages"); *see also Quiles*, 2018 WL 737403, at *2.

Nor-Son's primary focus is obtaining evidence of Laabs' past employment records regarding his performance at Doran and other construction employers for the purposes of limiting damages pursuant to the after-acquired defense. (Dkt. 51 at 14-15.) However, other than Doran, Nor-Son has proffered no evidence that Laabs misrepresented his performance at past employers or the reasons his employment ended at employers previous to Nor-Son. Given that admonishment by the Supreme Court in *McKennon*, *supra*, the Court will not permit a fishing expedition that is not proportional to the needs of the case with respect to any pre-Nor-Son employer, other than Doran, consistent with this Court's ruling on the subpoenas to Doran. *See*, *supra*, Section III.A. Given that Doran is already covered by the Court's ruling in the subpoenas, further relief with respect to Doran is duplicative. As such, Nor-Son's Motion to Compel with respect to records from pre-Nor-Son employment dealing with Laabs' performance, discipline, and reasons for leaving employment is denied.

As it relates to an authorization for records regarding Laabs' job search efforts after Nor-Son terminated his employment, Laabs argues that he has produced all documents in his possession relating to his job search efforts and that the information

17

sought is not relevant and is harassing, as every potential employer would be receiving requests for documents from Nor-Son and would be notified of Laabs' pending case against Nor-Son.  (Dkt. 59 at 20.)  To the extent that Nor-Son seeks information through Laabs' post-Nor-Son employment applications that Laabs has not represented to prospective employers that he was terminated for unlawful reasons, Laabs asserts that he has testified that he has represented to prospective employers that he was laid off by Nor-Son without stating his belief that Nor-Son did so unlawfully.  (*Id.*)

Laabs' attempts to find employment after his termination are directly relevant to his duty to mitigate, for which Nor-Son has the burden of proof.  *See Macgregor, Mallinckrodt, Inc.*, No. 01-828, 2003 WL 23335194, at *4 (D. Minn. July 21, 2003), *aff'd sub nom. MacGregor v. Mallinckrodt, Inc.,* 373 F.3d 923 (8th Cir. 2004); *see also Jacobson v. Pitman-Moore, Inc.*, 582 F. Supp. 169, 178 (D. Minn. 1984) (noting that a plaintiff must use "reasonable efforts to mitigate her damages" by searching for new employment).

Thus, the information sought by Nor-Son to verify whether Laabs submitted applications or resumes to prospective employers that Laabs has identified is relevant to the claims and/or defenses in this case.  Indeed, Laabs concedes that courts within this District have found that applications for employment after a plaintiff's departure from defendant are relevant to the issue of mitigation of damages.  (Dkt. 59 at 16-17.)  For example, in the disability discrimination case *Holter v. Wells Fargo and Co.*, the Court limited authorizations for records from employers as follows:

The Court will limit the authorization to records generated after her departure

from defendant as follows:

> I, the undersigned, do hereby authorize you to release the following documents and records you have regarding me to Ogletree, Deakins, Nash, Smoak & Stewart, P.C., or any representative or agent thereof.

> Application for employment; offer of employment; employment agreement; documents reflecting my job performance including any achievements, commendations, attendance, and discipline; any work accommodations provided to me; reason(s) for my departure from employment; summary of wages, salary or other compensation received by me; and summary of benefits received by me . . . .

281 F.R.D. 340, 345-46 (D. Minn. 2011). Another court in this District concluded that courts within this District have consistently found that defendants in employment discrimination cases are entitled to discover records related to the plaintiff's compensation and benefits from employment after his or her termination as relevant to the issue of mitigation of damages:

> This is not the first time that this District has been presented with the question of what a defendant in an employment discrimination suit is allowed to discover from other businesses that have subsequently employed the plaintiff. In fact, over the course of more than a decade, the Magistrate Judges of this District have repeatedly held that defendants in various employment discrimination cases are entitled to discover records related to the plaintiff's compensation and benefits from employment after his or her termination by the defendant.

> In the present case, and in accord with the aforementioned decisions, this Court agrees that Plaintiff's compensation and benefits information is relevant to the issue of mitigation in the present case.

*Hendrickson*, 2014 WL 12770229, at *4 (internal citations omitted) (collecting cases).

Thus, the information sought by Nor-Son to verify whether Laabs submitted applications or resumes to the prospective employers he identified is relevant to the claims and/or defenses in this case and proportional to the needs of the case with respect

to the issue of damages.  Any assertion by Laabs that he will be harmed because he may not be hired by one of the prospective employers is far too speculative to prevent Nor-Son from verifying (or calling into question) his claims of mitigation.  That said, Nor-Son **may only** issue at this time an authorization to prospective employers identified by Laabs that seeks Laabs' applications and supporting materials, resumes, and any offers of employment.[4]  Further, any authorization shall not mention that the document requests are for the purposes of ongoing litigation.

### 3.    Mental Health Records

### a.    Background

Laabs seeks damages for "emotional distress" under his ADA and MHRA claims. (Dkt. 1 ¶¶ 36, 43.)  In his answers to discovery, Laabs asserts that he:

> [I]s seeking only "garden variety" emotional distress damages.  He has neither been diagnosed with, nor sought treatment for, mental health issues before or after his termination, and does not assert in this litigation that he has suffered any physical injury as a result of Defendant's unlawful actions.

(Dkt. 53-1 at 38.)

Given Laabs' request for emotional distress damages, Nor-Son also served him with the following request for production of mental health records:

> **REQUEST NO. 25**:  Any and all mental health records or reports, or invoices or bills relating to medical treatment from all mental health care providers.  This includes, but is not limited to, health care records regarding alcoholism and violence.  Copies of a blank authorization for you to complete is attached.

---

[4]    The Court notes that Laabs has represented that, outside of odd jobs performed, he has not been employed since leaving Nor-Son.  (Dkt.53-1 at 38-39.)  To the extent that it is discovered that an offer of employment was made, the Court would be inclined to allow additional discovery.

**RESPONSE**:   Plaintiff objects to this request as overly broad, unduly burdensome, and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.   Plaintiff is seeking only "garden variety" emotional distress, has never sought mental health treatment, and does not claim he suffered any physical condition as a result of his termination.   Based on these objections, Plaintiff will not be producing any responsive documents or providing the requested authorizations.   *See, e.g., Womack v. Wells Fargo Bank*, N.A., 275 F.R.D. 571, 572 (D. Minn. 2011) (plaintiff does not put medical records at issue by merely claiming garden variety emotional distress); *Dochniak v. Dominium Mgmt*. Services, CIV. 06-237JRTFLN, 2006 WL 3156539, at *1 (D. Minn. July 26, 2006) (same), *aff'd sub nom. Dochniak v. Dominium Mgmt. Services, Inc*., 240 F.R.D. 451 (D. Minn. 2006).

(Dkt. 53-1 at 117-18.)

> **b.**    **Analysis**

Discoverability of medical records is governed by the relevancy standard of Rule 26 of the Federal Rules of Civil Procedure and not the "in controversy" standard required for an independent medical examination under Rule 35 the Federal Rules of Civil Procedure.  *See Sandoval v. American Bldg. Maint. Indus., Inc*., 267 F.R.D. 257, 268-69 (D. Minn. 2007).

Pursuant to Minnesota law, the medical privilege can waived as follows:

If at any stage of an action a party voluntarily places in controversy the physical, mental, or blood condition of that party, a decedent, or a person under that party's control, such party thereby waives any privilege that party may have in that action regarding the testimony of every person who has examined or may thereafter examine that party or the person under that party's control with respect to the same physical, mental, or blood condition.

Minn. R. Civ. P. 35.03.  This waiver, however, is limited by Minnesota Rule of Civil Procedure 35.04, which provides only for disclosure of medical records related to the

condition at issue.  *See* Minn. R. Civ. P. 35.04; *see also In re Baycol Products Litig.*, 219 F.R.D. 468, 470 (D. Minn. 2003).  "The policy underlying Rule 35.03 is the full disclosure of all relevant medical evidence concerning plaintiff's health when he voluntarily puts his health in issue by bringing a lawsuit."  *Wenninger v. Muesing*, 240 N.W.2d 333, 336 (1976); *see also Younggren v. Younggren*, 556 N.W.2d 228, 233 (Minn. Ct. App. 1996) ("A patient waives his physician-patient privilege if the patient puts his physical or mental condition into controversy.  Minn. R. Civ. P. 35.03.  This waiver, however, only allows the opposing party to obtain access to the patient's medical records. Minn. R. Civ. P. 35.04.").  Rule 35.03 is "also consistent with the concept that medical privilege should exist as a shield, not a sword."  Minn. R. Civ. P. 35.03, advisory committee's note (1968).

The Minnesota Supreme Court has not directly ruled on whether a plaintiff seeking garden-variety emotional distress damages places his mental health in controversy for the purposes of Rule 35.03.  However, this Court finds the Minnesota Supreme Court's decision in *Navarre v. South Washington County Schools*, 652 N.W.2d 9 (Minn. 2002), to be persuasive.  In *Navarre*, the plaintiff was placed on leave by the defendant due to complaints from teachers, students, and parents regarding her "teaching, her treatment of students, and her ability to control her classroom."  *Id.* at 16.  While on leave, defendant's assistant superintendent and superintendent gave several interviews to the Pioneer Press and Kare 11 relating to the complaints about the plaintiff.  *Id.* at 17-18. Navarre subsequently brought suit against the defendant and alleged multiple violations of the Minnesota Government Data Practices Act ("MGDPA"), along with claims for

negligent infliction of emotional distress and intentional infliction of emotional distress. *Id.* at 18. The claims of negligent infliction and intentional infliction of emotional distress were dismissed on summary judgment, and the matter proceeded to trial on the plaintiff's claims that the defendant had violated the MGDPA. At trial, Navarre sought damages for emotional distress and damage to her reputation, but only she and her father testified regarding her emotional distress, including her testimony that the impact of the media coverage left her "very sad, very depressed, lonely, [and] isolated." *Id.* Her father testified that Navarre was "distraught and upset about the Pioneer Press article and Kare 11 news coverage." *Id.* Navarre did not present any expert testimony pertaining to a medical diagnosis of her condition. *Id.* Navarre was awarded $250,000 by the jury for emotional distress. *Id.* at 21, 29. Along with concluding that violation of the MGDPA afforded emotional distress damages, the Minnesota Supreme Court held:

> Here, respondent failed to produce any verifiable medical or psychological evidence to support her claim but did introduce evidence indicating that appellant's disclosure of information made her extremely upset and caused her to be afraid to go out in public. While this evidence was conclusory and not substantiated by any medical testimony, we affirm the court of appeals and hold that the evidence was sufficient to allow respondent's emotional damage claim to be submitted to the jury. **However, the district court did not allow any impeachment of this testimony by cross-examination or the introduction of the respondent's prior medical and psychological history. The district court committed error in this regard. We hold that where a plaintiff seeks emotional damages under the MGDPA and puts her emotional state at issue, the defendant should be allowed to introduce probative evidence of the plaintiff's preexisting condition, treatment and prognosis, including expert testimony and/or medical records, that is relevant to the plaintiff's claim for emotional damages. We agree with the court of appeals that it may have been within the district court's discretion to deny an independent medical examination but that the denial appears to have been based in part on respondent's assertion that her existing medical records adequately documented her**

**emotional condition. However, these records were not received into evidence, although offered. Accordingly, we affirm the court of appeals and hold that the district court abused its discretion by not allowing appellant to introduce evidence related to respondent's preexisting emotional problems.**

*Id*. at 31-32 (internal citation omitted) (emphasis added).

As one court in this District has concluded:

> In short, while the parties did not label Navarre's claims for emotional distress as "garden-variety emotional distress," certainly her proof suggested that was what she was seeking, and the Minnesota Supreme Court found on that record that she had put her emotional distress at issue in the case. Further, the Court concluded that the trial court had committed error by not allowing the defendant to explore other explanations provided in her medical records for this alleged emotional distress.

* * *

> Pursuant to *Navarre*, once a plaintiff has placed his emotional state at issue, Wells Fargo is entitled to discover and introduce probative evidence of pre-existing conditions, treatment and prognosis, including the introduction of medical records relevant to the claim for emotional damages.

*Njema v. Wells Fargo Bank, N.A.*, No. CV 13-519 (PJS/JSM), 2014 WL 12648466, at *4-6 (D. Minn. Nov. 4, 2014).

Here, there is no dispute that Laabs is seeking emotional distress damages under the MHRA, as well as the ADA.

> When making a privilege determination, a court uses federal common law unless a relevant federal rule, statute, or constitutional provision applies. Fed. R. Evid. 501. But where state law determines the decision in a civil case, state law governs the privilege issue.

*Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *5 (D. Minn. Apr. 1, 2014) (citations omitted).

Since the Minnesota Supreme Court has provided that a defendant has the right to

present evidence that calls into question a claim of emotional damages under a Minnesota statutory cause of action (such as the MHRA), coupled with the possibility that Laabs has been diagnosed with depression at some point (Dkt. 53 ¶ 3), even if it is only related to his knee pain (Dkt. 60 ¶ 2), the Court finds that Nor-Son is entitled to medical documents relating to Laabs' mental health.  The authorization proposed by Nor-Son contains no time limitation for these mental health records.  (*See* Dkt. 69-1.)  Requiring Laabs to reveal all records related to his mental health is not necessary for Nor-Son to adequately make its defense.  The basis for allowing these documents is to determine if there were causes other than his termination that caused his emotional distress.  As such, allowing Nor-Son access to records five years prior to the end of Laabs' employment on October 25, 2019 through the present is sufficient.  *See, e.g.*, *Bates v. Delmar Gardens N., Inc.*, No. 4:15-CV-00783-AGF, 2016 WL 3543046, at *5 (E.D. Mo. June 29, 2016) ("The Court agrees with Plaintiff that requiring Plaintiff to reveal eleven years' medical records is not necessary for Defendants to adequately make their defense.  Therefore, the Court will limit the discovery of Plaintiff's medical information and records to five years preceding the alleged discriminatory conduct at issue.") (listing cases); *Lewis v. Temp-Air*, Inc., No. 4:14-CV-398 CDP, 2014 WL 5432122, at *2 (E.D. Mo. Oct. 27, 2014) (allowing for mental health records for three years prior to termination of employment); *Jensen v. Astrazeneca LP.*, No. CIV.02-4844 JRT/FLN, 2004 WL 2066837, at *4 (D. Minn. Aug. 30, 2004) (rejecting an authorization with no time limit and instead allowing for over six years of documents).  Anything further is not proportional to the needs of the case and borders on harassment.

Moreover, Nor-Son's proposed authorization is not limited to mental health records and could encompass every ailment suffered by Laabs regardless of the relevancy to this case. As such, the authorization must be limited to records pertaining to mental health treatment, including to the extent that it pertains to treatment for chemical dependency by a medical provider.

### 4. Deposition Regarding Doran Separation Agreement

Nor-Son complains that Laabs was improperly instructed during his deposition by his attorney not to answer questions regarding a separation agreement between him and Doran. (Dkt. 51 at 15-16.) Indeed, during his deposition, counsel instructed Laabs not to answer questions related to the substance of a severance agreement based on the likelihood of a confidentiality clause:

Q. Okay. Did you, were you given a severance agreement as part of leaving Doran?

A. Yeah.

Q. Okay. And did you sign the severance agreement?

A. I would assume so, yes.

Q. Okay. Do you remember how much severance you were given?

MR. REDDEN: I'm going to object on the basis that he is likely under a contract that has confidentiality as to the terms. And I'm confused as to the relevance to the case. If there is a Court Order then he should –

MR. ERICKSON: Well, then we're going to go, we're going to go to the judge and we're going to ask for fees because there's no privilege that's been raised here and we specifically asked for these documents in discovery and you've withheld those documents.

Q. You can go ahead and answer the question, sir.

MR. REDDEN: No, I'm instructing him not to answer.

MR. ERICKSON: Okay, we're going to go to the judge, we're going to go to the judge and we're going to seek fees.

MR. REDDEN: Do you want to do that now?

MR. ERICKSON: I'll do it at the appropriate time from my standpoint, sir.

(Dkt. 53-1 at 88-89.)

Ultimately, the Separation Agreement and Release of Claims ("Separation Agreement") was produced, and it was discovered that the agreement did not contain a confidentiality provision. (*See* Dkt. 53-1 at 120-29.) Nor-Son demands that Laabs be re-deposed with respect to the Separation Agreement and that it be awarded attorney's fees because Laabs refused to answer on the grounds of a factually baseless objection. (Dkt. 51 at 16.)

While the Court does not countenance Laabs' counsel's instruction not to answer questions with respect to the Separation Agreement, especially given the Protective Order in this case (Dkt. 38), this issue could have been easily resolved with a call to the Court using the informal resolution process (Dkt. 34 at 7) during the deposition, which Nor-Son refused to do (Dkt. 53-1 at 89). As such, the Motion to Compel is granted insofar as the Court will permit Nor-Son to depose Laabs again. However, Nor-Son will be allowed to ask questions to Laabs only relating the Separation Agreement, as it is relevant to the after-acquired evidence defense. This deposition should not serve a basis to ask additional questions to Laabs regarding Doran unrelated to the Separation Agreement.

Moreover, the Court will not award fees to Nor-Son because the need for a second deposition and consequent attorney's fees are in part self-inflicted.

### IV.   ORDER

1.    Plaintiff's Motion for Protective Order (Dkt. 43) is **GRANTED in part and DENIED in part** consistent with this decision.

2.    Defendant's Motion to Compel (Dkt. 49) is **GRANTED in part and DENIED in part** consistent with this decision.

3.    To the extent that the parties cannot agree on the language of the authorizations as outlined by the Court in this Order, the parties shall file their respective proposals along with a supporting letter (no longer than three pages) with the Court on or before **May 11, 2021** so that the Court can issue final authorizations.  The parties shall also send a Word version of their proposed authorizations to Magistrate_Wright_Chambers @mnd.uscourts.gov.  The Court **strongly** encourages the parties to resolve any disputes regarding the authorizations without the need for Court involvement.

Dated: April 26, 2021

*s/Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge
